## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| ATLANTIC WRECK SALVAGE, LLC | : | Hon. Joseph H. Rodriguez |
| | : | |
| *Plaintiff*, | : | Civil Action No. 1:14-CV-03280 |
| | : | |
| v. | : | **OPINION** |
| | : | |
| THE WRECKED AND ABANDONED VESSEL | : | |
| known as the *S.S. Carolina*, which sank in | : | |
| 1918, her engines, tackle, appurtenances and | : | |
| Cargo, | : | |
| | : | |
| *Defendant*. | : | |

This matter arises from the Motion to Intervene in the above-captioned case filed by prospective intervenor Rustin Cassway, the vessel RV Explorer and its owner, Research Vessel Explorer, LLC (collectively "Cassway") [Dkt. 38] and Plaintiff Atlantic Wreck Salvage's ("AWS") response and request for sanctions [Dkt. 43]. For the reasons set forth below, the Court denies Cassway's Motion to Intervene, and declines to award sanctions.

### I.     Factual Background and Procedural History

Cassway seeks to intervene in the above-referenced case, where this Court entered default judgment in favor of AWS on July 19, 2017. [Dkt. 21]. The above-captioned case concerns the salvage rights to the wreck of the S.S. Carolina ("the Carolina").

The Carolina was a passenger and cargo steam ship sunk by German gunfire on June 2, 1918 approximately 94 miles southeast of Sandy Hook, New Jersey. [Cassway Mot., Dkt. 38-1 at 5]. The Carolina's wreck rested unclaimed on the floor of the Atlantic Ocean until John Chatterton located the wreck in 1995 and filed a lawsuit in this Court on November 1, 1995 to arrest the Carolina. *See John B. Chatterton v. S.S. Carolina, The Wrecked and Abandoned*

*Vessel, etc.*, No. 95-cv-5776-JHR.  This court issued a Warrant of Arrest, appointing Chatterton the Substitute Custodian of the Wreck.  [Compl., Dkt. 1 at ¶ 7–8].  Chatterton also published an open letter to the diving community which informed other divers of the Carolina's location and invited them to dive the wreck.  [Dkt. 38-1 at 5].  Cassway alleges that he relied on this open letter and dove on the Carolina, though he does not specify when he began to visit the Carolina or how often he has visited the ship.  [Cassway Decl., Dkt. 38-4 at ¶ 3–4].  Chatterton did not renew his salvage rights to the Carolina and is not party to the present intervention motion.  [Chatterton Decl., Dkt. 38-2 at ¶ 10].

On May 22, 2014, AWS and its owner Joseph Mazraani filed a complaint *in rem* against the Carolina to obtain a possessory and ownership claim, a salvage award claim, and a salvage operation claim as to the Carolina.  [*See generally* Compl.].  That day, this Court issued a warrant for the Carolina's arrest.  [Dkt. 10].  On June 9, 2014, this Court ordered a special process server to post notice of AWS's claim upon the Carolina's wreck.  [Dkt. 11].  On June 16, 2014, this Court ordered the release of the arrest warrant against the Carolina [Dkt. 12], ordered AWS to publish notice of its arrest in a newspaper of general circulation [Dkt. 13], and appointed AWS as the Substitute Custodian of the Carolina.  [Dkt. 14].  Pursuant to these orders, AWS affixed notice papers to the wreck on June 15, 2014.  [Dkt. 16], and published notice of AWS's arrest of the Carolina in the Press of Atlantic City on June 21, 2014 [Dkt. 15].  AWS also published an article on the NJ Scuba Divers Message Board, an online forum for New Jersey scuba divers, which expressly stated that AWS "has secured an order from US District Judge Joseph Rodriguez arresting what remains of the … SS Carolina."  [Dkt. 43-1 at 16–17].  No one challenged AWS's claim to the Carolina.  On June 16, 2017, AWS moved for default judgment

against the Carolina. [Dkt. 21], and this Court granted the motion on July 19, 2017.  [Dkt. 22].

This default judgment granted AWS exclusive salvage rights to the Carolina.  [*Id.*].

AWS's case against the Carolina remained dormant until August 13, 2020, when AWS

filed an emergency motion for a temporary restraining order against Cassway.  [Dkt. 23].  This

motion sought to enjoin Cassway "from interfering with or violating AWS's sole and exclusive

right to salvage the Defendant vessel, S.S. CAROLINA and own any artifacts recovered

therefrom."  [*Id.*].  AWS claimed that Cassway and unnamed third parties participated in salvage

dives to the Carolina on or around July 20, 2020 and intended to conduct further dives as early as

August 14, 2020.  [Dkt. 23-1].  On September 1, 2020, the Court issued an order permanently

enjoining Cassway from interfering with AWS's ownership and salvage rights, specifying that

"parties may not alter or destroy the S.S. Carolina or remove any items from the S.S. Carolina."

[Dkt. 34].

On October 16, 2020, Cassway moved to intervene in AWS's case against the Carolina at

issue here.  [Dkt. 38].  If permitted to intervene, Cassway alleges that he will move the Court to

set aside the default judgment in favor of AWS and/or to dissolve AWS's permanent injunction

against Cassway by showing that AWS fraudulently procured default judgment and that AWS

has no protectable interest in the Carolina.  [Dkt. 38-1 at 13–14].

## II.    Legal Standard for Intervention

An applicant seeking to intervene in a lawsuit must show that "(1) the application for

intervention is timely; (2) the applicant has a sufficient interest in the litigation; (3) the interest

may be affected or impaired, as a practical matter by the disposition of the action; and (4) the

interest is not adequately represented by an existing party in the litigation."  *See Harris v.

Pernsley*, 820 F.2d 592, 596 (3d Cir. 1987) (citing *Commonwealth of Pennsylvania v. Rizzo*, 530

F.2d 501, 504 (3d Cir. 1976), *cert denied sub nom. Fire Fighters Union v. Pennsylvania*, 426 U.S. 921 (1976)).  "The proposed intervenor has the burden of proving each element and failure to prove any one of the [elements] is sufficient grounds to deny the motion." *Sec. & Exch. Comm'n v. Fishoff*, No. CV153725MASDEA, 2016 WL 1262508, at *2 (D.N.J. Mar. 31, 2016) (citing *Worthington v. Bayer Healthcare, LLC*, No. 11-3299, 2011WL 630999, at *2 (D.N.J. Dec. 15, 2011)).  District courts have wide discretion to permit or deny motions to intervene. *Donovan v. United Steelworkers of Am., AFL-CIO*, 721 F.2d 126, 127 (3d Cir. 1983).

For the reasons discussed below, the Court finds that Cassway has not shown that his intervention motion is timely.  Cassway's motion therefore fails at element (1), and the Court declines to consider elements (2)–(4).

### a.  Timeliness

While the timeliness element concerns the amount of time that an applicant waited to intervene, "[t]he mere passage of time … does not render an application untimely." *Benjamin ex rel. Yock v. Dep't of Pub. Welfare of Pa.*, 701 F.3d 938, 950 (3d Cir. 2012) (citation omitted). Courts in this circuit consider three additional factors: "(1) the stage of the proceeding; (2) the prejudice that delay may cause the parties; and (3) the reason for the delay." *Demarco v. Avalonbay Communities., Inc*., No. CV15628JLLJAD, 2016 WL 5934704, at *3 (D.N.J. Oct. 12, 2016) (citing *Princeton Biochemicals, Inc. v. Beckman Coulter, Inc.*, 223 F.R.D. 326, 328 (D.N.J. 2004)).

### i.  Factor (1) – Stage of the Proceeding

Factor (1) weighs against intervention because the Court entered default judgment in favor of AWS more than three years before Cassway moved to intervene in this case, and because AWS's 2014 arrest and publication placed Cassway on constructive notice of AWS's

claim to the Carolina more than six years before Cassway moved to intervene.  [Dkt. 22; Dkt. 38].  Post-judgment intervention "is usually disfavored because it creates delay and prejudice to existing parties*." United States v. Yonkers Bd. of Educ.*, 801 F.2d 593, 596 (2d Cir. 1986).  *See also Gaboratory, Inc. v. Gaboratory Int'l, Inc.*, No. CV 07-04725 MMM (EX), 2008 WL 11406057, at *4 (C.D. Cal. Oct. 20, 2008) (finding that intervention motion was untimely because it was filed after the court entered default judgment (citing *Calvert v. Huckins*, 109 F.3d 636, 638 (9th Cir. 1997)).  For this reason, "[p]ost-judgment intervention may only be permitted in extraordinary circumstances.'" *Bank of Am. Nat. Tr. & Sav. Ass'n v. Hotel Rittenhouse Assocs.*, 844 F.2d 1050, 1056 (3d Cir. 1988) (citing *Delaware Valley Citizens' Council for Clean Air v. Commonwealth of Pennsylvania*, 674 F.2d 970, 974 (3d Cir. 1982)).  *See also In re Fine Paper Antitrust Litig.*, 695 F.2d 494, 500 (3d Cir. 1982) ("[A] motion to intervene after entry of a decree should be denied except in extraordinary circumstances." (citations and quotations omitted)).

Due to this strong presumption against post-judgment intervention, courts in this circuit have denied intervention where, as here, an applicant seeks to intervene several years after a court entered judgment.  *See, e.g.,  Lusardi v. Xerox Corp.*, 975 F.2d 964, 984 (3d Cir. 1992) (upholding denial of motion to intervene based on district court's finding that the motion—filed three years after the judgment at issue—was "grossly untimely"); *United States v. Smith*, 48 V.I. 544, 548 (D.V.I. Oct. 19, 2006) (finding intervention motion filed four years after default judgment to be untimely).  Conversely, courts nationwide have emphasized the lack of final judgment when granting intervention.  *See, e.g.*, *Colony Nat. Ins. Co. v. Control Bldg. Servs.*, Inc., No. CIV. 14-CV-5651 WHW, 2015 WL 4757117, at *3 (D.N.J. Aug. 11, 2015) (permitting intervention because "[t]his litigation is in its early stages. Colony has moved for default

judgment … but the Court has not yet ruled on the motion."); *Houston Cas. Co. v. Int'l Grand Tours, Inc.*, No. C07-01188 RMW, 2007 WL 4249906, at *4 (N.D. Cal. Nov. 30, 2007) ("[B]ecause the court has not entered default judgment, Applicants' motion to intervene does not implicate the concerns of granting intervention following the entry of judgment."); *In re Fleck Indus., Inc.*, 16 B.R. 802, 805 (Bankr. E.D. Pa. 1982) ("The motion, in the instant case, was filed before the entry of a default judgment in this case.").

Here, Cassway moved to intervene more than three years after the Court entered default judgment in favor of AWS, a delay that other courts have called "grossly untimely." *See Lusardi*, 975 F.2d at 984. Thus, the question is whether Cassway has shown "extraordinary circumstances" that justify intervention. The Court finds that Cassway has failed to do so.

Cassway does not expressly argue that "extraordinary circumstances" prevented him from intervening sooner. Instead Cassway claims that he did not intervene earlier because he did not know of AWS's claim to the Carolina. [Cassway Reply, Dkt. 45 at 4]. Cassway further represents that he first learned of AWS's claim to the Carolina when AWS moved to enjoin Cassway from salvaging the Carolina in September 2020 and moved to intervene promptly thereafter. [Dkt. 38-1 at 9]. Because Cassway's notice and timeliness arguments are the only arguments that can be construed as "extraordinary circumstances" arguments, the Court will address these claims here, even though "reason for delay" is a separate factor.

The timeliness of post-judgment intervention "should be measured from the point at which the applicant" gained actual *or* constructive knowledge "of the risk to its rights." *In re Nat'l Football League Players' Concussion Injury Litig.*, No. 14-1995, 2019 WL 188431, at *7 (E.D. Pa. Jan. 14, 2019) (quoting *United States v. Alcan Aluminum, Inc.*, 25 F.3d 1174, 1183 (3d Cir. 1994)); *see also In re Fine Paper Anti-Trust Litigation*, 695 F.2d at 501, ("Although

appellants knew or **should have known** long before settlement that their interest was not protected, they failed to take the necessary steps….” (emphasis added));  *Haymond v. Lundy*, No. CIV.A. 99-5048, 2002 WL 31149289, at \*4 (E.D. Pa. Sept. 26, 2002) (“When a proposed intervenor knew or **should have known** of the pendency of a lawsuit at an earlier time, but failed to act at that time to protect its interests, that inaction will weigh heavily against the timeliness of the motion.” (citing *Delaware Valley Citizens' Council for Clean Air*, 674 F.2d at 975)) (emphasis added).  Courts regularly deny post-judgment intervention motions after finding that the intervenor was on constructive notice of the underlying lawsuit.  *See, e.g.*, *Delaware Valley Citizens' Council for Clean Air*, 674 F.2d at 974–75 (upholding district court's denial of intervention as untimely because intervenors were on constructive notice); *In re Nat'l Football League Players' Concussion Injury Litig.*, 2019 WL 188431, at \*7–\*8 (denying intervention motion as untimely because intervenor “received at least constructive notice” of the underlying lawsuit).

In the context of intervention motions, notice “may be implied from a variety of circumstances” including developments in the underlying lawsuit, such as “the filing of a complaint,” “class certification,” “litigating of  major or dispositive motions,” “the resolution process,” and “publicity about the lawsuit.”  *Floyd v. City of New York*, 302 F.R.D. 69, 89 (S.D.N.Y.), *aff'd in part, appeal dismissed in part*, 770 F.3d 1051 (2d Cir. 2014) (collecting cases).  *See also NAACP v. New York*, 413 U.S. 345, 366–67 (1973) (implying notice from a newspaper article and the intervenor's general “astuteness” about related matters, among other considerations).

Notice principles in maritime law are also relevant here.  According to maritime law and the Federal Rules of Civil Procedure Supplemental Rules for Admiralty or Maritime Claims

7

("Supplemental Rules" hereinafter), arrest and publication, respectively, place interested parties on constructive notice regarding a legal claim to a ship.  "[A]dmiralty law has traditionally presumed that seizure of a vessel in itself constitutes constructive notice to all parties with an interest in the vessel."  *DiGiovanni v. Kjessler*, 101 F.3d 76, 78–79 (9th Cir. 1996) (citing *Wong Shing v. M/V Mardina Trader*, 564 F.2d 1183, 1187 (5th Cir. 1977); *Loud v. United States*, 286 F. 56, 60 (6th Cir. 1923); *United States v. Steel Tank Barge H 1651*, 272 F. Supp. 658, 660 (E.D. La. 1967)).  *See also R.M.S. Titanic, Inc. v. Wrecked & Abandoned Vessel*, 9 F. Supp. 2d 624, 633–34 (E.D. Va. 1998), *aff'd in part, rev'd in part and remanded sub nom. R.M.S. Titanic, Inc. v. Haver*, 171 F.3d 943 (4th Cir. 1999) ("A recognized assumption in an *in rem* action is that a physical arrest of the res places those who have an interest in the res on notice of the in rem proceeding." (citing *The Mary*, 13 U.S. (9 Cranch) 126, 144, 3 L.Ed. 678 (1815))).  The Supplemental Rules additionally require plaintiffs in an *in rem* admiralty action to "give public notice of the action and arrest in a newspaper designated by court order and having general circulation in the district."  Fed. R. Civ. P. Supp. R. C(4); *see also* Local Rule LAMR (c)(2).  "Publication in a newspaper gives notice to the world of the in rem action."  *R.M.S. Titanic, Inc.*, 171 F.3d at 634 (citing *Darlak v. Columbus–America Discovery Group*, 59 F.3d 20, 22 (4th Cir. 1995), *cert. denied*, 516 U.S. 1094 (1996)).  *See also Thorsteinsson v. M/V Drangur*, 891 F.2d 1547, 1553 (11th Cir. 1990) (quoting *The Mary*, 13 U.S. (9 Cranch) at 144).  Courts have upheld these principles and found that interested intervenors received constructive notice regarding the disposition of a vessel, even when the intervenor had a documented interest in the vessel.  *See, e.g.*, *Tamblyn v. River Bend Marine, Inc.*, 837 F.2d 447, 448 (11th Cir. 1988) (holding that mortgage holder in a vessel was not entitled to "special notice" and denying intervention).

In this case, AWS constructively notified Cassway of its claim to the Carolina under maritime law and the Supplemental Rules approximately six years before Cassway moved to intervene.  AWS filed a complaint seeking possessory and salvage rights to the Carolina, served the Carolina by affixing process papers to the ship itself, and obtained an arrest warrant against the Carolina.  [Dkt. 9–10, 16].  Under admiralty law, this arrest provided "constructive notice to all parties with an interest in the vessel."  *DiGiovanni*, 101 F.3d at 79.  Following this Court's order, AWS also published a notice of arrest in the Press of Atlantic City, a paper of general circulation within the district.  [Dkt. 15].  This publication "served to supplement the presumed constructive notice given by the seizure."  *DiGiovanni*, 101 F.3d at 79.  Thus, AWS's arrest and publication constructively notified Cassway of AWS's claim to the Carolina under maritime law.

AWS provided additional notice beyond its arrest and publication when it published an article regarding its claim to the Carolina on the NJ Scuba Divers online message board on June 25, 2014.  [Dkt. 43 at 4; *id.* at Exh. 2].  The article explicitly stated that "New Jersey's Atlantic Wreck Salvage has secured an order from US District Judge Joseph Rodriguez arresting what remains of the … SS Carolina."  [Dkt. 43-1 at Exh. 2].  At least one local diver learned of AWS's claim to the Carolina through this article.  [Whittaker Decl., Dkt. 43-2 at ¶ 6].

Cassway's own reliance on online sources for information regarding New Jersey diving suggests that this June 25, 2014 article was significant.  Cassway claims that he and other divers began to dive the Carolina after reading and relying upon an "open letter to the diving community" that Chatterton published in 1995.  [Dkt. 38-1 at 5, 7; *id.* at Exh. B].  Based on Cassway's submission, it appears that Chatterton published this "open letter" on another online message board focused on New Jersey diving.  [*See* Dkt. 38-1 at Exh. B].  Cassway also claims that he is aware of a 2020 AWS Facebook post where AWS publicized its claim to the Carolina.

[Dkt. 38-1 at 7].  Thus, by his own admission, Cassway and others in the diving community

referred to and relied on information posted to online fora for information about the Carolina.

This 2014 article targeted at the diving community provided additional constructive notice to

Cassway and the rest of the diving community of AWS's claim to the Carolina.  *See NAACP*,

413 U.S. at 366–67 (holding that intervenor was constructively notified of a lawsuit because of

newspaper articles about the case and the intervenor's interest in related issues).

Additional evidence suggests that AWS's efforts successfully notified the local diving

community of its claim to the Carolina.  Captain William Cleary stated in a declaration that "[i]n

the period between … 2014 and 2015 … Mazraani and AWS arrested the SS Carolina.  **This was**

**widely known among the technical wreck divers as they are a very small community and**

**relatively few boats travelled the distance to the SS Carolina**."  [Cleary Decl., Dkt. 43-5 at ¶

2 (emphasis added)].  Captain Paul Whittaker stated that "AWS's arrest and admiralty claim to

the CAROLINA is widely known in the small New Jersey wreck diving community."

[Whittaker Decl., Dkt. 43-2 ¶ 8].  Similarly, Captain Sean Manni stated

> [A]s early as 2015, I had knowledge of the admiralty claim to the
> S.S. CAROLINA and the arrest of the vessel by Atlantic Wreck
> Salvage, LL [sic] owned by Joe Mazranni [sic].  Atlantic Wreck
> Salvage, LLC's claim to the S.S. CAROLINA and the arrest of the
> vessel was widely known by the small Northeast dive community.
> In 2015, I had several conversations and correspondence with
> Rustin Cassway regarding the status of the S.S. CAROLINA and
> specifically about Atlantic Wreck Services LLC's admiralty rights
> to the wreck.  During these conversations, I asked Rustin Cassway
> specific questions such as "are we allowed to dive the wreck or do
> we have to ask Joe's permission" and "If we dive the wreck, are
> we allowed to recover artifacts."

[Manni Decl., 43-4 at ¶¶ 4–6].  These declarations provide compelling evidence that

AWS's notice efforts caused information about its claim to the Carolina to circulate

within the "small New Jersey wreck diving community," even if they did not notify Cassway himself.

In sum, the Court finds that AWS's 2014 arrest of the Carolina and publication in the Press of Atlantic City by themselves placed Cassway on constructive notice of AWS's claim to the Carolina.  AWS's court filings, and the 2014 internet article targeted at the "small community" of New Jersey divers also placed Cassway on constructive notice of AWS's claim.  Because an intervention motion's timeliness depends on when an intervenor received constructive notice, *In re Nat'l Football League Players' Concussion Injury Litig.*, 2019 WL 188431, at *7, and Cassway received constructive notice more than six years before he moved to intervene, Cassway's motion was clearly untimely.

### 1.  Due Process

Cassway does not dispute that AWS arrested the Carolina, published notice in a newspaper of general circulation, or posted the 2014 NJ Scuba Divers article.  Instead Cassway asserts that AWS's notice efforts did not satisfy his Fifth Amendment due process rights because he never received notice of AWS's claim to the Carolina even though AWS knew Cassway's name and address.  [Dkt. 38-1 at 9, Dkt. 45 at 7–8].

The Court notes that Cassway does not expound on this argument and provides only one passing citation to the Supreme Court case *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950) for the conclusory argument that he was entitled to reasonable notice.  This lone reference is insufficient to fill significant gaps in Cassway's argument.  For example, Cassway does not argue or cite any authority stating that his interest in the Carolina as a "wreck diver and a research vessel captain" entitles him to notice that comports with constitutional due

11

process.[1]  [Dkt. 38-1 at 11–13].  *See Mullane*, 339 U.S. at 313 (noting that the Due Process

Clause requires notice before "deprivation of life, liberty or property").  Cassway also fails to

argue or identify any authority stating that constitutionally deficient notice efforts constitute

"extraordinary circumstances" that justify post-judgment intervention.  Similarly, Cassway does

not cite any authority stating that deficient notice overrides the principle, discussed above, that

courts measure the timeliness of intervention from the date of the intervenor's constructive

notice. The Court nevertheless finds that AWS's notice efforts did not violate Cassway's due

process rights.

Cassway's due process argument highlights a tension between general notice principles

under the Fifth Amendment's Due Process Clause and notice in maritime law.  On one hand,

constitutional due process requires notice "reasonably calculated, under all the circumstances, to

apprise interested parties of the pendency of [an] action and afford them an opportunity to

present their objections."  *Mullane*, 339 U.S. 306 at 314.  In *Mullane*, the Supreme Court held

that notice by publication alone is insufficient to meet this "reasonably calculated" standard

where the plaintiff knows the "whereabouts" of a party who may be deprived of property rights

in an *in rem* proceeding.  *Id.* at 320.  On the other hand, maritime law holds that arrest of a vessel

---

[1] Importantly, Cassway does not state that he will file a competing ownership claim to the Carolina if permitted to intervene.  Instead, he wishes only to assert that AWS's judgment "was procured by fraud" and that AWS has "no enduring protectable right" to the Carolina.  [Dkt. 38-1 at 13–14].  Further, Cassway cites *Indian River Recovery Co. v. The China* for the proposition that "[i]njury to recreational, aesthetic and environmental interests is, for purposes of standing, 'injury in fact.'"  108 F.R.D. 383, 387 (D. Del. 1985).  Nowhere does this case—or any other case which Cassway cites—guarantee notice consistent with constitutional due process when such interests are jeopardized.  *Cf. Stratman v. Watt*, 656 F.2d 1321, 1325 (9th Cir. 1981) (comparing plaintiffs with recreational and aesthetic interests in land with other plaintiffs who "held long-term federal grazing leases" on the land and finding that notice by publication in accordance with federal regulations "did not deny due process to those whose only connection with the land was, at the time of published notice, simply that of recreational users" (citing *Mullane*, 339 U.S. at 314)).

presumptively notifies all interested parties of a plaintiff's claim to the vessel, *DiGiovanni*, 101

F.3d at 78–79, and that publication under the Supplemental Rules presumptively notifies "the

world" of the plaintiff's claim to the vessel.  *R.M.S. Titanic, Inc.*, 171 F.3d at 634 (citing *Darlak*,

59 F.3d at 22).  The question, then, is whether *Mullane*'s reasonable notice standard requires a

maritime plaintiff to do more than arrest a vessel and publish notice of his claim to the vessel if

he knows the "whereabouts" of other parties known to have an interest in the vessel.

Cassway's due process claim hinges on the answer to this question.  Cassway essentially

argues that because he did not know of AWS's claim to the Carolina, and because AWS "had

[his] actual name[] and address[]," AWS's notice efforts must not have been "reasonably

calculated" to notify him.  [Dkt. 38-1, at 7, 9].  AWS does not argue that it attempted to notify

Cassway individually of its claim to the Carolina, but that it complied with all legal arrest and

publication requirements.  Assuming that Cassway was entitled to reasonable notice in the first

instance—a position which Cassway has not established—this case requires the Court to

consider whether AWS's arrest and publication under maritime law satisfied Cassway's due

process rights under *Mullane*.

At the outset, *Mullane*'s reasonable notice standard does not require or guarantee actual

notice in a maritime case or otherwise.  *See Dusenbery v. United States*, 534 U.S. 161, 171, 122

S. Ct. 694, 701, 151 L. Ed. 2d 597 (2002).  Further, what constitutes "reasonable" notice under

due process is not subject to a rigid formula, and "will vary with circumstances and conditions"

of the case.  *Walker v. City of Hutchinson, Kan.*, 352 U.S. 112, 115, 77 S. Ct. 200, 202, 1 L. Ed.

2d 178 (1956).

Due to their distinct historical and doctrinal origins, *in rem* maritime proceedings present

unique "circumstances" that require unique consideration of what constitutes reasonable notice.

13

*See Salazar v. Atl. Sun*, 881 F.2d 73, 76 (3d Cir. 1989) (noting that some federal courts have "reasoned that the unique historical and constitutional foundations of admiralty law may place maritime claims beyond the sweep of common law in rem cases.").  "Proceedings in rem against a vessel … have long been recognized as part of the maritime law administered by the district courts of the United States pursuant to … Article III, section 2 of the Constitution." *Techem Chem. Co. v. M/T Choyo Maru*, 416 F. Supp. 960, 967 (D. Md. 1976).  *See also Salazar*, 881 F.2d at 76 ("Arrest of a vessel is an *in rem* procedure in admiralty law having an ancient lineage."); Martin Davies, *In Defense of Unpopular Virtues: Personification and Ratification*, 75 Tul. L. Rev. 337 (2000) ("Davies" hereinafter) (explaining that United States maritime law principles emerged in England in the sixteenth century or earlier).  Maritime law "is a separate body of substantive and procedural law, distinct from common law." *Schiffahartsgesellschaft Leonhardt & Co. v. A. Bottacchi S.A. De Navegacion*, 773 F.2d 1528, 1535 (11th Cir. 1985).  *See also DiGiovanni*, 101 F.3d at 78 (noting that "[t]he Constitution established a separate jurisdictional base in the federal courts for admiralty cases. (citing U.S. Const. art. III, § 2, cl. 1.)); *Amstar Corp. v. S/S ALEXANDROS T.*, 664 F.2d 904, 908 (4th Cir. 1981) ("Congress and the Court have always recognized that maritime law differed from the common law.").  Thus, when "considering what would satisfy due process in an admiralty case, [courts] must be sensitive to admiralty law's unique nature as a separate body of substantive and procedural law." *DiGiovanni*, 101 F.3d at 78–79.  *See also Amstar Corp*, 664 F.2d at 912 ("Considering rule C in the light of the substantive maritime law which it implements, we conclude that it satisfies the minimum requirements of the due process clause."); *Merchants Nat. Bank of Mobile v. Dredge Gen. G. L. Gillespie*, 663 F.2d 1338, 1350 (5th Cir. 1981) (noting the "historical uniformity and

the unique character of the admiralty in rem procedures" in upholding the constitutionality of Supplemental Rule C).

One relevant and distinctive feature is that the ship itself is the defendant in an *in rem* maritime proceeding. *Luera v. M/V Alberta*, 635 F.3d 181, 184 (5th Cir. 2011) (quoting *Continental Grain Co. v. The Barge FBL–585*, 364 U.S. 19, 22–23, 80 S. Ct. 1470, 4 L. Ed. 2d 1540 (1960)) ("It is a 'long-standing admiralty fiction that a vessel may be assumed to be a person for the purpose of filing a lawsuit and enforcing a judgment.'"). *See also* Davies, *supra*, 341–66 (explaining the "personification theory" undergirding *in rem* admiralty actions and noting that "[t]he United States is virtually unique in its adherence to the doctrine of personification."). Indeed, "'a vessel is viewed as a juristic person, responsible in rem for the acts and omissions of her personnel, separate and distinct from her owner.... [In an in rem action,] [t]he owner of a vessel is an interested party, but not a necessary one.'" *In re Chugach Forest Prod., Inc.*, 23 F.3d 241, 245 (9th Cir. 1994) (quoting *All Pacific Trading, Inc. v. Vessel M/V Hanjin Yosu*, 7 F.3d 1427, 1431 (9th Cir. 1993)) (alterations in original). Rather than serve the owner or interested parties, "[i]t has long been a maritime tradition to post notice of arrest on the ship." *Oil Shipping (Bunkering) B.V. v. Sonmez Denizcilik Ve Ticaret A.S.*, 10 F.3d 176, 179 (3d Cir. 1993). *See also* Fed. R. Civ. P. Supp. C(3)(a) ("If the conditions for an in rem action appear to exist, the court must issue an order directing the clerk to issue a warrant for the arrest of the vessel or other property that is the subject of the action.").

Because maritime law traditionally distinguishes between a vessel and parties interested in the vessel, it also holds that

>  [t]hose with **any interest** in a ship … have a duty to stay aware of the events affecting that vessel.  This removes from the plaintiff in an admiralty action the cumbersome burden of attempting to locate

15

> and notify all those in the world who have any interest in the boat
> that is the object of the action.

*Tamblyn*, 837 F.2d at 448 (citations omitted) (emphasis added).  As a result of this "duty to stay aware," a party claiming an interest in a vessel can "reasonabl[y] … presume that a party with an interest in a vessel will keep itself apprised of events concerning that vessel."  *DiGiovanni*, 101 F.3d at 78.  And, as discussed above, arrest and publication of a vessel presumptively provide "constructive notice to all parties with an interest in the vessel," *DiGiovanni*, 101 F.3d at 78 (collecting cases), even if the interested parties have not performed their "duty to stay aware of the events affecting the vessel."  *Tamblyn*, 837 F.2d at 448.

In accordance with this "duty to stay aware" and related presumptions, courts have consistently found that plaintiffs who satisfy arrest and publication requirements thereby satisfy due process notice requirements.  *See, e.g.*, *Wong Shing v. M/V Mardina Trader*, 564 F.2d 1183, 1187 (5th Cir. 1977) (rejecting argument that interested party was entitled to personal service holding that "[s]ince the notice was sufficient and given in the manner required by law, the appellants' Fifth Amendment due process argument is also without merit.").  *See also Oil Shipping (Bunkering) B.V.*, 10 F.3d at 180 ("When the Marshal posted his handbill on the ZIYA S's wheel house, he gave constructive notice of the arrest to the whole world."); *Tamblyn*, 837 F.2d at 448 (holding that lienholder residing in a foreign country "received all the notice due to him by law" via publication compliant with Supplemental Rule C); Davies, *supra*, at 354 ("Service of process on the ship within the jurisdiction at the time of the arrest is adequate notice to the true defendant to the action, in the same way that personal service of process on a nonmaritime defendant satisfies due process requirements.") (citations omitted).  The Court sees no reason to find otherwise in this case.

Against this overwhelming weight of authority, the Seventh Circuit reached the opposite

conclusion in *Ehorn v. Sunken Vessel known as "ROSINCO"*, 294 F.3d 856, 857 (7th Cir. 2002).

There, the plaintiff Ehorn retrieved a porthole from the wreck of the Rosinco, a ship abandoned

in Lake Michigan off the shores of Kenosha, Wisconsin. *Id.* After learning of Ehorn's activities,

the State of Wisconsin claimed that it owned the Rosinco under the Abandoned Shipwreck Act

of 1987, 43 U.S.C. §§ 2101–06, and criminally prosecuted the Ehorn for looting the Rosinco. *Id.*

While the criminal matter was pending, Ehorn initiated an *in rem* admiralty proceeding against

the Rosinco in federal court. *Id.* Ehorn arrested the Rosinco and published notice of his arrest in

two newspapers. Ehorn did not directly notify any branch of Wisconsin's government of his

admiralty claim until one day before the period to challenge Ehorn's claim expired, when

Ehorn's counsel inadvertently notified state prosecutors. *Id.* at 858. However, Wisconsin

miscalculated its deadline and filed an untimely response. *Id.* Ehorn moved for default

judgment, and the federal district court granted Ehorn's admiralty claim to the Rosinco. *Id.*

Unimpressed with Ehorn's back-door effort to avoid criminal prosecution, the Seventh

Circuit held that the Ehorn's failure to provide written notice to the State of Wisconsin—Ehorn's

"major, if not only, rival for ownership"—violated Wisconsin's due process rights because the

arrest and publication were not reasonably calculated to notify Wisconsin of the admiralty claim.

*Id.* at 859. The court reasoned that "Admiralty Supp. R. C *requires* publication but does not

*forbid* personal service, nor would a prohibition make sense…. [A]rrest in admiralty does not

always ensure that the principal competing claimant has actual knowledge of the contest." *Id.*

(emphasis in original). Because Ehorn did not directly notify Wisconsin of his claim, the court

concluded that Wisconsin's time to respond, "has not started to run" and that the district court

erroneously default judgment in favor of Ehorn. *Id.* at 860.

The Court finds the Seventh Circuit's holding and reasoning to be unpersuasive.  The *Ehorn* Court's analysis has an obvious flaw: it relies almost exclusively and without explanation on non-admiralty *in rem* cases when determining Ehorn's notice obligations.  *See id.* (citing *Dusenbery*, 534 U.S. at 161 (cash); *Mullane*, 339 U.S. at 315; (trust fund); *Greene v. Lindsey*, 456 U.S. 444, 102 S. Ct. 1874, 72 L. Ed. 2d 249 (1982) (residential apartment); *Schroeder v. City of New York*, 371 U.S. 208, 83 S. Ct. 279, 9 L. Ed. 2d 255 (1962) (real property); *Walker v. Hutchinson*, 352 U.S. 112, 77 S. Ct. 200, 1 L. Ed. 2d 178 (1956) (real property); *City of New York v. New York, New Haven & Hartford R.R.*, 344 U.S. 293, 73 S. Ct. 299, 97 L. Ed. 333 (1953) (lien against railroad property)).  But the case at hand was not an ordinary *in rem* action; it was an *in rem* admiralty proceeding.  This is not just a semantic distinction but, as discussed above, a distinction grounded in the Constitution and centuries of jurisprudence.  *See Salazar*, 881 F.2d at 76 ("Arrest of a vessel is an in rem procedure in admiralty law having an ancient lineage."); *DiGiovanni*, 101 F.3d at 78–79 (citing U.S. Const. art. III, § 2, cl. 1).  And, as discussed above, federal courts have long recognized that standards for "reasonable notice" in admiralty proceedings are distinct from "reasonable notice" standards in ordinary *in rem* proceedings.[2]  Since the *Ehorn* court glossed over maritime law's particularities without analysis or explanation, the Court declines to follow its reasoning or holding here.[3]

---

[2] As a result of this approach, the *Ehorn* court appears to have found that a "competing claimant" is entitled to personal service and actual notice of another party's maritime claim.  *Ehorn*, 294 F.3d at 858–59 ("[A]rrest in admiralty does not always ensure that the principal competing claimant has actual knowledge of the contest.").  Not only did the *Ehorn* court omit citations to authority for this proposition, it contradicted an assumption fundamental to admiralty law: "that a party with an interest in a vessel will keep itself apprised of events concerning that vessel…." *DiGiovanni*, 101 F.3d at 79 (citing *Tamblyn*, 837 F.2d at 448 n.1).  *See also Dusenbery*, 534 U.S. at 171 (2002) (noting that due process does not require actual notice).

[3] *Ehorn* is also readily distinguishable from this case.  In *Ehorn*, the State of Wisconsin claimed an ownership interest in the Rosinco and enforced that ownership interest through criminal proceedings.  *Ehorn*, 294 F.3d at 857.  The court relied heavily and repeatedly on the fact that

With this discussion in mind, the Court rejects Cassway's claim that AWS violated his due process rights to fair notice.  Cassway argues that because he did not actually know of AWS's claim to the Carolina, and because AWS "had the actual names and addresses" of him and other divers, AWS's notice efforts must not have been "reasonably calculated" to notify him.[4]  [Dkt. 38-1 at 7, 9].  But maritime law and facts of this case belie Cassway's argument.  AWS arrested the Carolina according to this Court's orders and applicable procedural rules, affixed notice of its claim to the Carolina, notified the public of its claim in a paper of general circulation, and perfected its claim after no party challenged AWS.  As decided above, this process constructively notified Cassway of AWS's claim to the Carolina.  *Oil Shipping (Bunkering) B.V.*, 10 F.3d at 180 ("When the Marshal posted his handbill on the ZIYA S's wheel house, he gave constructive notice of the arrest to the whole world."); *R.M.S. Titanic, Inc.*, 9 F. Supp. 2d at 633–34 ("A recognized assumption in an in rem action is that a physical arrest of the res places those who have an interest in the res on notice of the in rem proceeding." (citing *The Mary*, 13 U.S. (9 Cranch) at 144)); *Id.* ("Publication in a newspaper gives notice to the world of the in rem action." (citing *Darlak*, 59 F.3d at 22)).  Having complied with this Court's orders and Supplemental Rule C, AWS was under "no obligation to give special notice of the admiralty proceedings" to Cassway.  *Tamblyn*, 837 F.2d 448 (holding that mortgage holder in a vessel was not entitled to "special notice").

---

Wisconsin was the "principal competing claimant" to the Rosinco.  *E.g. id.* at 860.  Here, Cassway is not the "principal competing claimant;" he asserts no ownership claim, and readily admits that he and his dive team are members of a community of divers who visit the Carolina. [Dkt. 38-1 at 5–6].

[4] To the extent that Cassway believes he was entitled to actual notice, his argument fails.  *See Dusenbery v. United States*, 534 U.S. at 171.

Cassway also argues that he "was not required to search legal databases to find AWS's arrest and claim over the wreck of the S.S. Carolina." [Reply, Dkt. 45 at 9]. The law does not support this argument. To the contrary, if Cassway had an interest in the Carolina as he alleges here, he bore the responsibility "to keep himself apprised of events concerning" the Carolina, including AWS's legal claim to the wreck. *DiGiovanni*, 101 F.3d at 79.

Because AWS constructively notified Cassway of its claim to the AWS and because Cassway had a duty to inform himself of events affecting the Carolina—including AWS's legal claim—it was reasonable for AWS to "presume" that Cassway would learn of AWS's claim to the Carolina. *See id.* at 78. It follows that AWS's notice efforts were reasonably calculated to notify Cassway of its legal claim, and that Cassway "received all the notice due to him by law." *Tamblyn*, 837 F.2d at 448.

Thus, even if Cassway was entitled to reasonable notice of AWS's claim to the Carolina, and even if constitutionally deficient notice constituted an "extraordinary circumstance" that overcame the presumption against post-judgment intervention, Cassway's due process argument would fail because Cassway has not shown that AWS violated his due process rights. AWS constructively notified Cassway of its claim to the Carolina in 2014, but Cassway did not intervene in this case until 2020—six years after AWS's notice efforts and three years after this Court entered default judgment in favor of AWS. The default judgment that this Court entered in 2017 therefore weighs against intervention.

### ii.  Factor (2) – Prejudice

Factor (2) also weighs against intervention. "The most important consideration in deciding whether a motion for intervention is untimely is whether the delay in moving for intervention will prejudice the existing parties to the case. If prejudice is found, the motion will be denied as untimely." 7C Fed. Prac. & Proc. Civ. § 1916 (3d ed.). "[T]he stage of the

proceeding is inherently tied to the question of the prejudice the delay in intervention may cause to the parties already involved." *Mountain Top Condo. Ass'n v. Dave Stabbert Master Builder*, Inc., 72 F.3d 361, 370 (3d Cir. 1995).  For that reason, courts have found there to be prejudice when "all critical issues have been resolved, and a final Order has been entered." *Cmty. Vocational Sch. of Pittsburgh, Inc. v. Mildon Bus Lines, Inc.*, No. CV 09-1572, 2017 WL 1376298, at *5 (W.D. Pa. Apr. 17, 2017) (quoting *Rizzo*, 530 F.2d at 506–07) and citing (*In re Fine Paper Antitrust Litigation*, 695 F.2d at 500.  Permitting intervention after a court has entered final judgment "would deprive [a party] of the finality that the entry of judgment in its favor provides." *Gaboratory, Inc.*, 2008 WL 11406057, at *4.

The Court finds that permitting intervention in this case would unduly prejudice AWS.  AWS secured its salvage rights to the Carolina by obtaining default judgment from this Court more than three years before Cassway intervened.  To do so, AWS followed all rules, laws, and Court orders.  Permitting intervention would deprive AWS of the finality of this judgment, and signal that any person with an alleged interest in the Carolina can frustrate AWS's properly obtained salvage rights at any time.  Moreover, because Cassway ultimately seeks to challenge AWS's exclusive salvage rights to the Carolina, Cassway's intervention does not seek merely to "reconfigure an ancillary term" of this Court's default judgment.  *Banco Popular de Puerto Rico v. Greenblatt*, 964 F.2d 1227, 1232 (1st Cir. 1992).  Instead, Cassway aims to "disturb the core judgment" granted to AWS.  *Id.*  Factor (2) strongly disfavors intervention.

### iii.   Factor (3) – The Reason for Delay

Factor (3)—the reason for delay in seeking intervention—also counsels against intervention.  As discussed at length above, Cassway argues that he did not intervene sooner because he did not know of AWS's claim to the Carolina.  For the reasons discussed above with

respect to factor (1), the Court rejects Cassway's argument and finds that this factor supports non-intervention.

Ultimately, all three timeliness factors weigh against intervention in this case. Because Cassway has failed to show that his motion is timely, the Court need not consider the other elements that Cassway must prove to intervene in this case. *Fishoff*, 2016 WL 1262508, at *2 ("[F]ailure to prove any one of the [elements] is sufficient grounds to deny the motion"). Cassway's motion to intervene is therefore denied.

### III.   AWS's Request for Sanctions

AWS indicates that it intends to "serve a Rule 11 motion for sanctions [against Cassway] for filing the instant motion in bad faith, simply to harm, harass and cause undue expense to Plaintiff.… Sanctions under 28 U.S.C. § 1927 also may be appropriate." [Dkt. 43 at 14]. Because AWS has not actually presented a motion for sanctions for the Court's consideration, the Court will not award sanctions at this juncture.

### IV.   Conclusion

For the reasons discussed above, Cassway's intervention motion is denied as untimely. The Court also declines to award sanctions. An appropriate order will follow.

April 13, 2021                                     /s/      Joseph H. Rodriguez

                                                  Hon. Joseph H. Rodriguez, USDJ